**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff,**

v.

**BRIAR LAKE DEVELOPMENT CORPORATION, Defendant.**

Civ. A. No. 90–1538(SSB).

United States District Court,
D. New Jersey.

April 20, 1990.

Robert J. Del Tufo, Atty. Gen. by Richard F. Engel, Deputy Atty. Gen., State of N.J., Dept. of Law and Public Safety, Trenton, N.J., for plaintiff.

John F. Rodgers, Jr., Haddonfield, N.J., for defendant.

## OPINION

BROTMAN, District Judge.

Presently before the court is the motion of the State of New Jersey Department of Environmental Protection (hereinafter "NJDEP") for an order to show cause with temporary restraints. Essentially, this is an application for immediate access to property owned by defendant Briar Lake Development Corporation (hereinafter "BLDC"). The property is adjacent to the Gloucester Environmental Management Services, Inc. Landfill in Gloucester Township, Camden County, (hereinafter the "GEMS landfill"), and NJDEP contends that it needs access to permit the cleanup of the GEMS landfill to proceed. The court held a hearing on April 12, 1990, at which both parties were present, and entered an order granting the requested relief. This opinion addresses the reasons for the entry of that order.

## I. FACTS AND PROCEDURE

This action is brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (hereinafter "CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767 (1980), as amended by the Superfund Amendments and Reauthorization Act of 1986 (hereinafter "SARA") Pub.L. No. 99–499, 100 Stat. 1613 (1986), codified at 42 U.S.C. § 9601 *et seq.*, and the New Jersey Spill Compensation and Control Act (hereinafter the "Spill Act"), N.J. Stat.Ann. § 58:10–23.11 *et seq.*

The court is extremely familiar with the GEMS landfill, and oversees the litigation surrounding the clean-up efforts there. *NJDEP v. GEMS*, Civil No. 84–152. Nonetheless, some review of the background to this relatively straightforward lawsuit will help to explain the action taken.

The GEMS landfill is a 60 acre site that has operated under various names, and by different entities, since the 1950's. It is currently ranked 12 on the National Priority List of hazardous waste sites for clean-up under CERCLA. *See* 40 C.F.R. Part 300, App. B (July 1, 1989). In addition to municipal waste, the landfill contains large quantities of chemical and hazardous substances. The site is elevated from 80 to 100 feet around the surrounding terrain, and stands next to a surface water body known as Holly Run that flows into a small pond known as Briar Lake.

In February, 1983, the United States Environmental Protection Agency (hereinafter the "EPA") initiated response actions at the site by installing culverts at the head of Holly Run, and by placing a fence around a portion of Holly Run and Briar Lake. The fence, which remains standing and is on part of the property to which NJDEP now seeks access, was erected because of the contamination of Holly Run and Briar Lake caused by the landfill. That contamination was documented in a remedial investigation/feasibility study prepared by the EPA in July, 1985.

After public comment, the EPA issued a Record of Decision (hereinafter "ROD") listing the following remedial actions for the GEMS landfill:

1. Construction of a security fence.

2. Installation of a multimedia cap on top of the landfill and installation of a clay and soil cover on the sides.

3. Construction of an active gas collection and treatment system.

4. Construction of a ground water pumping and treatment system.

5. Implementation of remedial action to connect selected homes to an existing public water supply system.

6. Remediation (clean-up) of Holly Run and Briar Lake.

Verified Complaint at 4–5 (pp. 14). In August, 1988, the EPA issued an order pursuant to Section 106 of CERCLA directing the PRPs to perform the ROD.

NJDEP had filed suit in 1980 in the Superior Court of New Jersey, Chancery Division, seeking closure of the landfill, recovery of response costs, and penalties.[1] The case was removed to federal court in 1984 when the EPA was named as a defendant. *See New Jersey State Department of Environmental Protection v. Gloucester Environmental Management Servs. Inc.,* (hereinafter *"NJDEP v. GEMS"*), 719 F.Supp. 325 (D.N.J.1989) (detailing procedural history of enforcement action).

That action encompasses approximately 250 parties which have been divided into the four sub-groups: owners, operators, generators and transporters. The litigation itself has been divided into two phases. The first phase was directed to the clean-up of the landfill, and was largely settled in January, 1988, approximately when 100 potentially responsible parties (hereinafter "PRPs") signed an Administrative Consent Order (hereinafter the "ACO") patterned after the ROD that was subsequently approved by the court. Pursuant to the ACO, the parties paid approximately $32.5 million to a Trust established to oversee a multi-year effort to implement the remediation.

The cleanup commenced on June 4, 1989, and is proceeding pursuant to the terms of the ACO, although there have been some delays brought on by opposition by local landowners and others. *See Neighborhood Toxic Cleanup Emergency v. Reilly,* 716 F.Supp. 828 (D.N.J.1989). *See also New Jersey Department of Environmental Protection v. Hurst,* Civil No. 89–5216(SSB) (NJDEP suit for access). The cleanup has proceeded this far because of the cooperation of hundreds of PRPs who agreed to the Phase One settlement, the tireless efforts of Hon. Jerome Simandle, the United States Magistrate who has been overseeing the case management of *NJDEP v. GEMS,* the patience and reasonableness of hundreds of attorneys, and the work of the engineers responsible for the actual cleanup at the site.[2] It is within this delicate truce that the instant litigation arises.

This general overview of the GEMS-related litigation provides some backdrop to NJDEP's claim that denial of access could hurt the delicate balance that has permitted the cleanup to proceed. The Verified Complaint alleges that:

The remediation of the GEMS Landfill is proceeding in a sequence. The work has been completed to the point where the next sequence involves the removal of contaminated sediments in Holly Run and Briar Lake at the BLDC property, which sediments are to be transported to the top of the landfill. Further remediation work cannot continue until the sediments in Holly Run and Briar Lake on the BLDC property are excavated.

Verified Complaint at 6 (paragraph 20). The remediation must commence with the Holly Run and Briar Lake, the upstream areas; to commence with the downstream areas would be futile, for they would become contaminated again when sediments are later extracted from the upstream areas. Thus, the Verified Complaint alleges that "[f]ailure to gain access will cause the remediation to stop." *Id.* at 3 (paragraph 5).

1. NJDEP initially did not rely on CERCLA, which provides for exclusive federal jurisdiction. 42 U.S.C. 9613(b). Since the case was removed and the EPA was dismissed, NJDEP has amended its complaint to state a claim under CERCLA.

2. The Trust and NJDEP have contracted with Canonie Environmental Services Corporation for the Phase One remediation. Affidavit of Lawrence Longo at 5 (pp. 11) (Appendix B to Verified Complaint).

Although NJDEP had been negotiating with defendant for access to allow the cleanup to continue, *see* Affidavit of Douglas Martin (Appendix E to Verified Complaint), NJDEP's offers were viewed as insulting and those discussions have come to a halt. The instant verified complaint was filed soon thereafter.

## II. DISCUSSION

■ The usual standard for a preliminary injunction [3] order is well-established: parties seeking an injunction must show:
(1) that there is a reasonable probability that they will succeed on the merits; (2) that they will be irreparably harmed if the injunction is not granted; (3) that they will suffer more harm if the injunction is not granted tha[n] defendants will suffer if the injunction is granted; and (4) that the granting of the injunction is not contrary to the public interest.
*Delaware Valley Transplant Program v. Coye*, 678 F.Supp. 479, 481 (D.N.J.1988) (citing *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3rd Cir.1985). *Accord Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 150–51 (3rd Cir. 1984); *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3rd Cir.1982).

■ Plaintiff need not show irreparable harm, however, where Congress has displaced the normal equitable balancing with a statutory standard. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 310–13, 102 S.Ct. 1798, 1802–03, 72 L.Ed.2d 91 (1982). *See United States v. City and County of San Francisco*, 310 U.S. 16, 30–31, 60 S.Ct. 749, 756–57, 84 L.Ed. 1050 (1940). In *Weinberger*, the Supreme Court recognized the centuries-old history of courts' exercising equitable discretion in issuing injunctions, "a practice of which Congress is assuredly well aware." *Id.*, 456 U.S. at 313, 102 S.Ct. at 1803. The Court then stated that "[o]f course, Congress may intervene and guide or control the exercise of the court's discretion, but we do not lightly

assume that Congress has intended to depart from established principles." *Weinberger*, 456 U.S. at 313, 102 S.Ct. at 1803 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944)). " 'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.' " *Id.* (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946)).

■ In examining CERCLA to ascertain whether Congress intended to displace a court's equitable jurisdiction, the court is "guided by well-settled principles of statutory construction." *Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 909 (3rd Cir.1990). " '[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *Id.* at 909–10 (quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). *See United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). As the Third Circuit explained, "the plain meaning rule is 'an axiom of experience' and does not preclude consideration of persuasive legislative history if it exists; the 'circumstances of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect.' " *Id.* at 910 (quoting *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981)). "In sum, if the statutory language is clear and plain, a court must give it effect unless the legislative history is such that a literal reading 'will produce a result demonstrably at odds with the intention of [the] drafters....' " *Id.* at 910 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 3249, 73 L.Ed.2d 973 (1982)).

---

**3.** A hearing on a temporary restraining order may be converted into a hearing on a preliminary injunction when there is notice and the hearing is adversarial. *Delaware Valley*, 678 F.Supp. at 480 n. 1.

**66**

The plain language of CERCLA suggests that Congress did intend to displace the equitable standards that a court would apply in most instances. Section 104(e) of CERCLA specifically authorizes "any duly designated officer, employee, or representative of a State" to enter "any vessel, facility, establishment, place, property, or location which is adjacent to the vessel, facility, establishment, place, property, or location...." 42 U.S.C. 9604(e)(1) (Supp. 1989). Section 104(e) further provides:

> Where there is a reasonable basis to believe that there may be a release or threat of release of a hazardous substance or pollutant or contaminant, the court shall take the following actions:
>
> (i) In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

42 U.S.C. 9604(e)(5)(B) (Supp.1989). The plain meaning of this section is that a court must issue an injunction when the EPA or State agency has "a reasonable basis to believe" there may be a threat of release of a hazardous substance. The statute's repeated use of the word "shall" indicates that the court has no discretion; the statutory language is mandatory. The other words chosen by the drafters of CERCLA likewise evince an intent to depart from the irreparable injury standard. The agency seeking access need not show that irreparable injury to obtain an order granting access; it is sufficient to show "that there *may* be a release or *threat of release.*" 42 U.S.C. 9604(e)(5)(B) (Supp.1989) (emphasis added).

The statute makes no distinction between properties containing hazardous substances and those that are merely adjacent to such properties. The statute authorizes entry to "[a]ny ... property where entry is needed ... to effectuate a response action under this subchapter." *Charles George Trucking,* 682 F.Supp. at 1272. It makes no difference that BLDC's land may itself contain no hazardous substance, for access is needed to effectuate the response at the adjacent GEMS landfill.

Other courts that have considered whether Congress displaced the usual equitable standard have reached the same conclusion. *E.g., United States v. Fisher,* 864 F.2d 434, 438 (7th Cir.1988); *United States v. Genzale Plating, Inc.,* 723 F.Supp. 877, 887 & n. 8 (E.D.N.Y.1989); *United States v. Long,* 687 F.Supp. 343, 344 (S.D. Ohio 1987); *United States v. Charles George Trucking Co., Inc.,* 682 F.Supp. 1260, 1274 n. 22 (D.Mass.1988) *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 191–193 (D.C.Mo.1985).

The legislative history of CERCLA in general and Section 104 in particular reinforces the plain meaning of the statutory language. CERCLA is a remedial statute which must be liberally construed. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir. 1986) (citations omitted). Congress had in mind two primary purposes when designing CERCLA:

> First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.

*Id.* (quoting *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1112 (D.Minn.1982). Only the first purpose is relevant here, and of the two, the first is preeminent.

Courts have uniformly observed that "[t]he primary purpose of CERCLA is 'the prompt cleanup of hazardous waste sites[.]'" *Voluntary Purchasing Groups, Inc. v. Reilly,* 889 F.2d 1380, 1386 (5th Cir.1989) (quoting *Dickerson v. Administrator, Environmental Protection Agency,* 834 F.2d 974, 978 (11th Cir.1987) (quot-

ing *J.V. Peters & Co. v. EPA*, 767 F.2d 263, 264 (6th Cir.1985) (citation omitted))). *See, e.g., B.R. MacKay & Sons, Inc. v. United States*, 633 F.Supp. 1290, 1292 (D.Utah 1986) ("It appears that with the dangers or potential dangers caused by hazardous substances, shooting first and asking questions later was the intent of Congress, making it clear that under CERCLA, the EPA should have and has full reign to conduct or mandate uninterrupted cleanups for the benefit of the environment and the populous.").

Prior to the 1986 amendments, CERCLA was interpreted by some courts as not permitting immediate access in a non-emergency situation. *Outboard Marine Corp. v. Thomas*, 773 F.2d 883 (7th Cir.1985), *vacated*, 479 U.S. 1002, 107 S.Ct. 638, 93 L.Ed.2d 695 (1986); *United States v. Wade*, 546 F.Supp. 785, 793–94 (E.D.Pa.1982), *appeal dismissed*, 713 F.2d 49 (3rd Cir.1983). The Third Circuit, however, reached the opposite result and held that, "although not explicitly stated in the statute," CERCLA did not permit pre-enforcement judicial review of response actions. *Lone Pine Steering Comm. v. United States Environmental Protection Agency*, 777 F.2d 882, 886–87 (3rd Cir.1985) (dismissing challenge to costs of cleanup as premature), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

Congress put to rest any doubts as to the operation of Section 104 when it enacted SARA, which amended CERCLA. As Judge Pollak aptly summarized the relevant legislative history concerning the timing of judicial review of remedial actions under CERCLA:

> In debate on the 1986 amendments, several legislators emphasized that the timing-of-review provisions should be read broadly to preclude review of any action under CERCLA until the time at which review is specifically permitted under the appropriate subsection of 9613(h). In Senator Thurmond's words, "[t]he timing of review section is intended to be comprehensive.... [It] covers all issues that could be construed as a challenge to the response, and limits those challenges to the opportunities specifically set forth

in the section." 132 Cong.Rec.S. 14929 (daily ed. Oct. 3, 1986). Representative Glickman expressed the same understanding when he stated that "[t]he only opportunity for review that is not specifically provided for in the timing of review provision is the opportunity set forth in new section 121(f)(2) and (3), the clean-up standards section relating to remedial actions secured under 106 [42 U.S.C. 9606] and remedial actions at facilities owned or operated by a Federal agency.... This opportunity does not exist for fund-financed remedial action." 132 Cong. Rec.Reg. H9582 (daily ed. Oct. 8, 1986). *Cabot Corp. v. United States Environmental Protection Agency*, 677 F.Supp. 823, 827 (E.D.Pa.1988). *Accord Dickerson v. Administrator, Environmental Protection Agency*, 834 F.2d 974, 977 (11th Cir. 1987) ("CERCLA precludes pre-enforcement review of EPA response actions").

■ The legislative history to the amended statutory framework makes clear that access for reponse actions should be granted first, and that compensation should be determined later to avoid any delays. Turning to the facts of the instant case, it is clear that NJDEP has satisfied the statutory standard. The land owned by defendant is adjacent to the GEMS landfill. Entry is needed to effectuate a response action. 42 U.S.C. 9604(e)(2)(D) (Supp.1989). NJDEP has a reasonable basis to believe that there is a threat of release of a hazardous substance if entry is not permitted. 42 U.S.C. 9604(e)(5)(B) (Supp.1989). Accordingly, plaintiff's representative is entitled to immediate access.

Defendant will be compensated for temporary loss of use of the land which is the subject of this action. In fact, defendant conceded at oral argument that it was willing to allow access for the remediation to continue, but that the price offered by NJDEP was inadequate. Since the amount of compensation is the only issue in this litigation, *cf. Cabot Corp.*, 677 F.Supp. at 829 n. 6 (suggesting that where landowner claims irreparable rather than compensable injury, CERCLA may not provide notice and opportunity to be heard consistent with

due process), NJDEP is entitled to immediate access.

The court finally notes that the public interest favors the issuance of the order. If each individual landowner were permitted to delay the cleanup until satisfactory compensation were determined, the cleanup might be delayed for years. This is precisely the result the 1986 amendments to CERCLA sought to avoid.

Since NJDEP is entitled to the relief it seeks under CERCLA, and because there would be no federal jurisdiction over the Spill Act claims absent a CERCLA claim, it is unnecessary to address, at this time, whether NJDEP would be entitled to immediate access under the Spill Act.

## III. CONCLUSION

For the foregoing reasons, the court entered an order granting immediate access to plaintiff and plaintiff's representatives for the purpose of completing the clean-up of the GEMS landfill.